by the jury.   Here it was undisputed that the plaintiff followed her friend, who preceded her by about six feet, and who, without hastening her steps, crossed in safety.   The space between the north-bound car and the west track was slight, and plaintiff's vision in the northerly direction was obscured by the car behind which she passed, and, as she heard no gong sounded, or other warning of an approaching car, we cannot say that she was guilty of contributory negligence because she may have erred in thinking she could follow her companion in safety.

Our conclusion, therefore, is that the judgment entered upon the verdict should be affirmed, with costs.

PATTERSON and LAUGHLIN, JJ., concur.   VAN BRUNT, P. J., and McLAUGHLIN, JJ., dissent.

---

(75 App. Div. 157.)

CROFOOT v. SYRACUSE, B. & N. Y. R. CO. et al.

(Supreme Court, Appellate Division, Third Department.   July 8, 1902.)

1. RAILROADS—MISPLACED SWITCH—INJURY TO ADJOINING BUILDING—EVIDENCE —SUFFICIENCY FOR JURY.

Plaintiff and another obtained a license, without pay, to place a storehouse on defendant's land, beside a switch.   An express train ran onto the switch, causing a collision and fire, which burned the cars and storehouse.   The switch lock was found immediately after the accident to have been broken, the switch turned and held by a board and iron bar in position to turn a train from the main track; and the target light was out, with the wick turned down into the oil.   It was proven that all trainmen carried keys to the switch locks, that the freight cars standing on the side track were placed there two days before, that trains had since passed in the same direction as the one which met with the accident, and that the target light was burning two hours before, showing the switch to be then closed.   Held not to sufficiently indicate that the displacement was the act of some trainmen, for which defendant might be liable, to justify submission of the question to the jury.

2. SAME—LICENSE—ASSUMPTION OF RISK.

Defendant had never employed a watchman to watch that switch, and the station agent, who was joint owner with plaintiff of the storehouse, testified that he never thought it necessary.   Held, that plaintiff and his associate, in placing the storehouse there under the license, assumed the ordinary risks, and defendant was not negligent so far as they were concerned in maintaining things in the same condition after the license was granted as before.

3. SAME—INSTRUCTION.

In an action against a railroad company for damages resulting from a fire caused by an overturned engine, an instruction to the jury to take the case, and if they found from the evidence, applying it perfectly fairly, that the company was negligent, then to assess the damages, was error, since it gave the whole field to the jury to speculate in, and discover that, according to their private notions, the business had not been conducted properly.

Appeal from trial term.

Action by Henry C. Crofoot against the Syracuse, Binghamton & New York Railroad Company and another.   From a judgment for plaintiff, and from an order denying a new trial, defendant railroad company appeals.   Reversed.

The action is brought by plaintiff to recover the value of a storehouse and contents, owned by plaintiff and defendant Wright, which were burned on the night of December 12, 1895. The complaint charges that the fire was the result of the negligence of the railroad company. The fire was started by the overturning of a locomotive engine hauling an express train, which, in passing the station at Preble where the storehouse was erected, ran into an open switch, collided with some freight cars, and resulted in the overturning of the engine, the killing of the engineer, and the burning of the cars which made up the express train, and from these burning cars the fire was communicated to the storehouse.

Argued before PARKER, P. J., and KELLOGG, SMITH, CHASE, and FURSMAN, JJ.

Jenney & Jenney, for appellant.

John S. Conway (Lawrence T. Jones, of counsel), for respondent.

KELLOGG, J. The cause of the accident was an open or misplaced switch. The switch was what is known as a "Horton Safety Switch." It could connect the side track with the main track only by raising a lever weighted by an iron ball, and held in that position. When released, the weighted lever dropped to the ground, and disconnected the side track from the main track. When not used to move cars upon the side track, it was kept locked with a padlock. A standard was connected with the switch, provided with elevated targets, which worked automatically, and indicated to approaching trains the condition of the switch. If open, a red target showed by day, and a red light by night. If disconnected, a white target was shown in the daytime, and a white light in the nighttime. The accident occurred at 11 o'clock on Sunday night. On examination of the switch immediately after the accident, the lever of the switch was found to be raised, and fastened in that position with a portion of fence board and an iron bar. The lock was found to have been broken. The target light was out, and the wick turned down into the oil. The accident did not disturb the switching apparatus, the standard, or the target light. These facts are supported by the undisputed testimony on the trial, except a single witness, Dr. Matthews, who says, in substance, that he had the impression that he saw the light burning after the accident, but "I don't know." It was proven that all trainmen carried keys which unlocked the padlock which secured the switch lever. It was also proven that the switch had not been used to run cars upon the side track at any time after Saturday night prior to the accident, which occurred on Sunday night, and that a milk train moved over the main track going south (in the same direction the express train was going) at 6 o'clock Sunday morning. The station agent, Wright, who was equal owner with plaintiff of the storehouse and contents, testified that the freight cars on the side track at the time of the accident were placed there Saturday night; he saw them there Sunday. It would therefore seem to have been conclusively established that no trainmen in the discharge of their duties had negligently left the switch in the condition in which it was found. Nor is there any proof that trainmen ever before had kept the switch open by propping up the lever in any manner, or had ever before broken the padlock or turned down the target light. It was also shown by witness Wright, whose

duty it was to clean and light the target lamp on this switch, that the light was burning at nine o'clock p. m.,—two hours before the accident,—showing the switch to be closed, and in proper condition for the safety of trains moving south on the main track. The only reasonable conclusion from this testimony is that the switch had been operated purposely, and permanently connected the siding with the main track, and the light extinguished, between 9 and 11 o'clock p. m., by some one with a criminal intent to derail the next south-bound train, and the company was in no way responsible for this act of displacement. It was therefore error on the part of the learned trial court to submit to the jury, over the objection and exception of defendant, that they might find that the displacement was the result of the act of some trainmen, for which defendant might be held liable. Station Agent Wright had been in charge of this station for many years, and is also interested with plaintiff in the action. He testified, "I never thought there was any necessity for employing a switchman for the sole purpose of taking care of that switch;" and the learned court properly charged the jury "that it was unreasonable to expect that some man would stay there, on the part of the company, and watch and care for this switch." There is no evidence whatever in the case from which the jury had a right to conclude that the engineer was negligent in running his train. The alleged negligence of defendant is therefore narrowed down to the single proposition: Was it, so far as plaintiff and Wright are concerned, actionable negligence on the part of the company to continue to maintain, after the permission was given to build the storehouse, the same condition of things as was before maintained; that is, the water tank, and the switch partially hidden thereby? It seems to me the statement of the proposition raised no doubt whatever. The defendant owed no duty to the plaintiff and Wright to remove the water tank, or to make the targets upon the switch less obscure. The situation of both water tank and switch was well known to both Wright and plaintiff when they obtained permission to erect a building on defendant's premises. They obtained without pay a license or permission revocable on 60 days' notice. There was no promise to pay rent, and no promise, express or implied, to change the water tank or switch, or change the methods of using either, or change defendant's method of doing its business. The rule in such a case is that the person obtaining the permission must assume all the ordinary risks attached to the nature of the place and the business carried on. Even had plaintiff promised to pay a rental for the ground he was to occupy, he could not require defendant to change the location or management of the switch, or require defendant to employ a man to watch or attend it. It was therefore error on the part of the learned court to leave it to the jury to say whether, in this respect, defendant might not have failed in its duty to plaintiff and Wright.

So far as I am able to discover, the foregoing are the only propositions submitted to the jury. They are, however, by the charge, not very clearly defined. It is impossible to say what the jury might have understood the learned court to mean in its final instruction, in this language:

"So, gentlemen, you will take this case; and if you find from the evidence, applying it perfectly fairly, that this company was not negligent in the operation of its road, that they took such precautions as. a prudent and careful man would have taken in the conduct of his business, why, then, you need go no further. If you find the reverse,—that the company was negligent in causing the accident,—then you assess the damages."

· This portion of the charge was excepted to. That this instruction gave the whole field to the jury to speculate in, and discover that, according to their private notions, the business had not been conducted prudently, or in conformity with the jury's idea as to how a railroad business should be conducted, is apparent. The danger of sending a jury to sea without a pilot or compass might be less if the learned court should instruct the jury to report in writing the precise negligent act or omission upon which they based their verdict. Then, if the court were unable to instruct them what must be found to sustain a verdict, the record would still show what they did find. The exceptions to the charge and the requests to charge fairly raised the several propositions we have referred to, and the charge and disposition of the requests were a practical instruction to the jury that they had a right to speculate, and there was no legal limit to their inquiry, and no legal standard by which they were to judge the defendant guilty or not guilty of a failure in its duty to this plaintiff. Under such a presentation the jury might well have come to the conclusion that the defendant was negligent in not providing more men to extinguish fires when defendants' locomotives overturn, or they might have concluded that a prudent conduct of a railroad business does not admit of unforeseen accidents, and that every accident not traceable to the act of God necessarily establishes negligence in business management. The error of leaving so wide a discretion to a jury is too obvious for comment.

The judgment should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.